## HENRY EXALL ELROD CO. v. TATE.
### (No. 9697.)

(Court of Civil Appeals of Texas. . Fort Worth. Nov. 26, 1921.)

**Master and servant ⬅➡332(2)—Scope of supervising engineer's authority held for jury.**

Where subcontractors were engaged in paving under the supervision of an engineer employed by a firm of supervising engineers, and it developed that the plans for the curb or gutter encroached upon the foundation of a gasoline filling station owned by plaintiff, and that upon refusal of the subcontractor to disturb such foundation the engineer seized a sledge hammer and displaced the foundation, thereby damaging it, *held* that the evidence raised the issue whether the engineer, in destroying the foundation of gasoline tank, was acting within the general scope of his authority and in furtherance of the undertaking of the defendant firm of supervising engineers, regardless of whether he was authorized to do the very act in question, and it was not error to refuse a peremptory instruction for defendant.

Appeal from District Court, Parker County; F. O. McKinsey, Judge.

Action by W. E. Tate, Sr., against Henry Exall Elrod Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Carter & Queen, of Weatherford, for appellant.

Hood & Shadle and Martin & Hook, all of Weatherford, for appellee.

CONNER, C. J. In the early part of 1919 the city of Weatherford contracted for the paving of its public square, and employed the Henry Exall Elrod Company, of the city of Dallas, as supervising engineers. One Nicolette was employed by said contracting engineers as the resident engineer, with instructions to see that the plans and specifications of the supervising engineers were executed. During the progress of the work on the south side of the square, the subcontractors engaged found that the plans for the curb or gutter encroached upon the foundation of the gas filling station constructed and owned by the appellee, W. E. Tate, Sr. The construction force refused to disturb the foundation when directed to do so by Nicolette, who thereupon with a sledge hammer displaced the foundation and thereby damaged it. This suit was accordingly instituted by Mr. Tate against the engineering company to recover damages, and the trial resulted in a judgment in his favor for the sum of $595, from which the supervising engineering company have prosecuted this appeal.

Appellee alleged the employment of Nicolette in the capacity stated, and charged that he was at the time he caused the damage acting within the scope, or apparent scope, of his authority from the engineering company, and this issue, in so far as it is necessary to here state, was the material issue submitted by the court.

Appellant first assigns error to the refusal of the court to give the following requested instruction:

"You are further instructed as to the law in this case that the plaintiff's testimony upon the trial of this cause has failed to support the allegations in his petition; therefore you will find for the defendant and so say by your verdict."

It is apparent that the instruction is peremptory in its character, and that it should not have been given if the evidence was such as to raise the issue submitted by the court. The evidence has been carefully considered, and the only material question about which there can be any controversy in it is that of Nicolette's authority. The evidence is undisputed that Nicolette was the resident engineer under the employment of the appellant firm, and that he was the man who, using a sledge hammer, damaged the foundation of the filling station of appellee as alleged. He denied his authority to do this, and testified that it was no part of his duty to do so. Several witnesses in behalf of appellant testified that it was no part of the duty of the resident engineer to himself take the sledge hammer and remove the obstruction placed by the foundation· of the filling station. Mr. Nicolette, among other things, testified:

---

⬅➡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"My duties were to superintend the construction, giving alignments, laying grades, inspecting material, and seeing that the construction work complied with the plans and specifications; carrying out the contract of the defendant here. Sometimes, if it was necessary that I do the actual work of construction, I have been doing it. I had never been instructed by the defendant here to do any of the actual work. As to the physical work, of handling rock, making curb, it was not my duty to do any work like that. The defendant did not authorize me to do any of the actual work."

David Drennan, a witness in behalf of appellant, among other things, testified:

"The Willite Company were doing the actual construction work here. They had a contract. They were doing the work on the gutter and curb. As representing the city, we only recognized the contractor. Q. Were you doing, in your work, any part of the construction of the curb and gutter? A. Yes, sir. That is part of the plans and specifications under which we were acting here. We were not to do any part of the actual work; just to see it done properly; oversee it, lay grades, see it built of proper material, and proper elevations and proper lines. As to how it was done we had no interest, unless it was being improperly done, and then we would stop it. We were looking for results, and that was all. Mr. Nicolette here was resident engineer at that time. We sent him here. I know what instructions he had here, under our employ, namely, to see that the plans and specifications were followed to the letter. Under his instructions from our company he had no authority to do any of the actual work. If, on or about the 24th of April, in the construction of this work down here, Mr. Nicolette took a sledge hammer and did the actual breaking of any part of the curb or gutter in connection with or close up to Mr. Tate's pump, he did that without our knowledge, and it would have been without our consent, had we known anything about it. * * * It is not the duty of an engineer to do that kind of work. That is contractor's work. Q. Was it the duty of the men working under him to do it? A. It is the duty of the contractor. They were not working under us. We were supervising the work to see it was properly done. If they were trying to construct that gutter three inches too far north, it would not be our business to see it to the proper place. It would be our business to tell the contractor they were putting it too far north. It would be our business to see the contractor had it in the proper place. If they are trying to put it too far north or south it would be our duty to report that to the contractor and have him put it in the right place. If he would not do that, then it is our duty to go to the proper authorities, the city officials, and say the contractor is not executing our orders."

Henry Curtis, a witness for the plaintiff, testified in part that:

He was present and heard Mr. Tate tell Nicolette "not to knock this piece of curbing out from under the tank, and this fellow [Nicolette] told his men to knock it out, and they would not do it, so he said he would knock it out himself, and he knocked it out with a sledge hammer. I saw him when he struck it. Just before that I heard him say he was under big bond, and he said he had to put that curb in there, and he was going to do it right. I heard Mr. Tate protesting to him before he struck it."

There was other testimony of like tendency.

Appellant's proposition is that when the servant turns aside, for however short a time, from the prosecution of the master's work to engage in an affair wholly his own, he ceases to act for the master, and the responsibility for that which he does in pursuing his own business or pleasure is upon him alone. And the following cases are cited in support of the proposition: I. & G. N. Ry. Co. v. Cooper, 88 Tex. 607, 32 S. W. 517; Branch v. I. & G. N. Ry. Co., 92 Tex. 288, 47 S. W. 974, 71 Am. St. Rep. 844; G., H. & S. A. Ry. Co. v. Currie, 100 Tex. 136, 96 S. W. 1073, 10 L. R. A. (N. S.) 367.

In the case first cited the plaintiff, while riding defendant's freight engine, by invitation of the engineer and fireman, was injured by hot water turned on him by the engineer through a hose, the end of which had been inserted in plaintiff's pocket by the fireman; the engineer and fireman intending in sport to pour cold water on the plaintiff. It was held that the act was not within the scope of their employment, and that the employer, the railroad company, was not liable. The other cases cited but furnish illustrations of the same rule, but we think they are plainly distinguishable from the case before us. We are of the opinion that the evidence clearly shows that Nicolette, at the time, was engaged in the prosecution of his principal's business. He was endeavoring to carry into effect his instructions, viz. to see that the curbing was constructed according to the plans and specifications furnished him by his principal. The fact that it was not expected of him to do any part of the manual labor is immaterial to a solution of the question.

In the case of Ry. Co. v. Anderson, 82 Tex. 516, 17 S. W. 1039, 27 Am. St. Rep. 902, it was said:

"To hold the master liable for the act of his servant, it is not necessary that the servant should have authority to do the particular act. The act of the servant may be contrary to his express orders, and yet the master may be liable. But the act must be done within the scope of the general authority of the servant. It must be done in furtherance of the master's business, and for the accomplishment of the object for which the servant is employed."

The rule announced in the quotation was expressly approved by our Supreme Court in the case of Railway Co. v. Cooper, 88 Tex. 607, 32 S. W. 517. An illuminating illustration of the rule is to be found in the case of Burnett v. Oechsner, 92 Tex. 588, 50 S. W. 562, 71 Am. St. Rep. 880. In that case

one Williams, who was in charge of a farm in Wichita county owned by Burnett, gathered and hauled some hogs, belonging to a neighbor, which had been trespassing upon the farm, over into Oklahoma, whereby they were lost to the owner. The hogs had been eating up the corn on the farm, and Williams had been instructed to keep them out, but he had been given no special instructions further than to "keep them out." Williams' purpose in removing the hogs from the farm was to thereby prevent further injury to the crops. It was there contended, as here, that Williams' act was outside the scope of his authority, and that Burnett was not responsible. But it was held otherwise, and the rule as stated in Railway Co. v. Anderson, supra, was again approved, and the court held that, inasmuch as Williams removed the hogs for the purpose of keeping them out of the field that he in legal contemplation, acted within the scope of his authority and in furtherance of the master's business.

We are of the opinion that the case last cited presents the rule that should be applied here. The evidence, we think, raised the issue, if it does not undisputedly show, that Nicolette, in destroying the foundation of appellee's gasoline tank was acting within the general scope of his authority and in furtherance of his master's undertaking, that therefore the court committed no error to the prejudice of appellant in submitting the issue nor in refusing the requested instruction.

There is another assignment complaining of the refusal of a special charge, in substance the same as the first, except that it required a determination of an issue presented in the plaintiff's pleadings that the appellant company had ratified Nicolette's act, but inasmuch as, for reasons already stated, the court would not have been authorized to instruct the jury that Nicolette was not acting within the scope of his master's authority and inasmuch as the court did not submit the issue of ratification, we think the second and only remaining assignment must also be overruled without further discussion.

Judgment affirmed.